## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| TRICIA DANYUS and JUSTIN DANYUS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 19-1258 |
| | ) | |
| KENDRA SLAMA DEROSA, RICK | ) | |
| BLEICHNER, THERESA CIARDINI, | ) | |
| TRACY WOLF, and TOWN OF NORMAL, | ) | |
| ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND OPINION

This matter is now before the Court on Defendants DeRosa, Bleichner, and Town of Normal's (collectively "Normal Defendants") Motion to Dismiss Plaintiffs' Complaint under Fed. R. Civ. P. 12(b)(6) (ECF No. 18) and Defendants Ciardini and Wolf's Motion to Dismiss Plaintiffs' Complaint under Fed. R. Civ. P. 8(a) and 12(b)(6) (ECF No. 23). For the reasons stated below, the Normal Defendants' Motions to Dismiss Plaintiffs' Complaint is GRANTED IN PART and DENIED IN PART. Defendants Ciardini and Wolf's Motion to Dismiss Plaintiffs' Complaint is DENIED.

## BACKGROUND

Plaintiffs Tricia Danyus ("Tricia") and Justin Danyus ("Justin") (collectively "Plaintiffs") are foster parents to J.H., who is now sixteen years old, and the adoptive parents of I.D., who is now four years old, and J.D., who is now three years old.[1] I.D. and J.D. are biological siblings and J.H. is their half-sister. On or about August 18, 2017, Plaintiffs began taking I.D. and J.D. to A

---

[1] The alleged facts in the Background section are derived from Plaintiffs' Complaint (ECF No. 1).

Shining Star Learning Center in Normal, Illinois for daycare because they were having difficulty affording the previous daycare the children had attended. Justin had concerns about the new daycare after dropping off I.D. and J.D., because the teachers were cold and unwelcoming, and he was told I.D. would be spending time in a gym with older children. He contacted the adoption worker to express his reservations. On or about August 21, 2017, Justin secured spots for I.D. and J.D. at their previous daycare; however, because they were not scheduled to start until September 5, 2017, the children continued to attend A Shining Star Learning Center. On August 22, 2017, when Tricia picked up the children, she was given an accident report related to a visible bump on J.D.'s head, but nobody explained to her what had occurred. When she got home, she also noticed a hand-shaped mark on J.D.'s buttock while changing his diaper. A few days prior, I.D. had come home with two fingerprint-shaped bruises on her arm. Tricia feared that the daycare employees caused the injuries on both children. Tricia photographed the injuries, and after sharing the pictures with Justin, they decided to remove the children from A Shining Star Learning Center.

On August 27, 2017, Tricia posted the pictures of the marks on I.D. and J.D. to Facebook and indicated that she believed the employees of A Shining Star Learning Center caused them. The Facebook post was initially private and visible only to friends and family, but Tricia made it public after a friend requested that she do so. The post was subsequently shared and commented on by hundreds of people. The next day, someone called the police to anonymously report the allegations in Tricia's post. Shortly thereafter, Defendant Kendra Slama DeRosa ("DeRosa"), a police officer/detective from Normal, Illinois, contacted Tricia and asked her to come to the police station to give a recorded statement. DeRosa also contacted A Shining Star Learning Center and asked for the names of the employees who had access to I.D. and J.D.

On August 28, 2017, DeRosa went to A Shining Star Learning Center and interviewed the employees for approximately fifteen to twenty minutes each, as well as the director and owner of the daycare for thirty minutes. DeRosa also watched a video of I.D. bumping his head. Supposedly, she did not ask to watch videos of J.D.'s diaper changes, or of I.D. in the classroom, to determine if the marks had been caused by any of the employees.

Later that day, Tricia went to the station where DeRosa interrogated her for approximately one hour. Initially, DeRosa did not issue any *Miranda* warnings and was looking at Tricia's cell phone pictures. At some point during the interrogation, DeRosa did mirandize her. Tricia informed DeRosa that I.D.'s and J.D's physical therapist told her that she had previously heard of similar instances happening at A Shining Star Learning Center, and that another mother had contacted her to say that she was worried about marks on her child. DeRosa allegedly did not take down the names of the physical therapist or the other mother in order to investigate further. Tricia believed that DeRosa was attempting to pin the bruises on her instead. During the interrogation, DeRosa stated that she had talked to the daycare workers who told her that arm bruises were not out of the ordinary and that they did not cause them. Tricia alleges that DeRosa wanted her to say she was not suspicious of the arm bruises, and admit the daycare employees caused them, so that DeRosa could end her investigation. DeRosa told Tricia that if she returned to the daycare and watched all the videos, and it did not show the handprint being caused by a daycare employee, then the handprint must have come from someone at home. After the interrogation, DeRosa contacted the Department of Children and Family Services ("DCFS") who then put DeRosa in touch with Defendant Theresa Ciardini ("Ciardini"), an assigned investigator to the matter.

DeRosa allegedly waited until August 31, 2017, to review the video from the day the mark on J.D.'s buttock occurred. According to Plaintiffs, the video shows the following: daycare

workers abusing and neglecting children, a teacher grabbing I.D. forcefully by the arm and pulling him around the room, a teacher grabbing I.D. by the shirt, yelling at him, smacking his hand away from his mouth, teachers shoving children to the floor, a teacher ignoring a crying child after an adult-sized rocking chair had fallen on him, a teacher changing multiple diapers without changing gloves or washing her hands in between, and a teacher gripping J.D.'s buttock with a dirty latex glove for an extended period of time.

On September 1, 2017, DeRosa called Tricia to the police station for a second round of interrogation. Ciardini was also present and watched DeRosa interrogate Tricia from another room. DeRosa allegedly told Tricia that she had seen the employees of A Shining Star Learning Center doing a good job when she reviewed the video. Tricia maintained that neither she nor J.H. caused the mark; however, DeRosa kept insisting that if Tricia admitted that she had caused the mark they "could deal with it" and that, if she had, it would normally just be considered "parental discipline." (ECF No. 1 at 10). DeRosa also stated that everything pointed to Tricia having done it and that the marks did not come from the daycare. DeRosa then left Tricia alone in the interrogation room for over an hour while she interrogated J.H.

During J.H.'s interrogation, she told DeRosa that she did not hear a smack or a cry around the time Tricia discovered the mark on J.D.'s buttock. J.H. further told DeRosa that Tricia had been alone with J.D. for a matter of seconds before Tricia called for J.H. to bring her a phone to photograph the mark. DeRosa then returned to Tricia and told her that J.H. stated that J.D. is difficult to change, so Tricia must have used force on J.D. to try to get him to sit still, causing the mark. Tricia began to cry and said she did not think of that possibility and she would never hurt J.D. DeRosa continued to assert that the bruises did not occur at the daycare. DeRosa stated that the only person who could have left the mark on J.D. was Tricia. She purportedly asked whether

Tricia was sorry for blaming the daycare, given that it had lost multiple customers as a result. Shortly thereafter, Ciardini went into the room to interrogate Tricia. Ciardini said she agreed with DeRosa that it was Tricia who had caused the mark. Ciardini also allegedly stated that spanking a kid is not abuse or neglect. Tricia was still insisting that she did not smack J.D. and that another mother told her that her child had been spanked and forced to pee his pants at the daycare. Ciardini then allegedly said "honey, you just need to admit that you did that at some point, you really do, I mean nobody is going to take your license, nobody is going to take your kids, nothing that bad is going to happen . . . you smacked him on the butt, that's it . . . you can't get charged for that." *Id.* at 12. Ciardini further stated "the fact that you smacked him on the butt . . . does not make you a child abuser." *Id.* Ciardini eventually left Tricia crying in the room alone to wait for DeRosa to return. DeRosa returned about seven minutes later and continued to interrogate Tricia. DeRosa asked Tricia if she had smacked J.D. on the bottom with the intent not to hurt him and Tricia falsely admitted that she had done so. DeRosa then told Tricia that she had spoken with the state's attorney and that Tricia would be arrested and criminally charged for her actions.

On or about September 5, 2017, Tricia was arrested for filing a false police report and obstruction of justice, both of which are felonies. She spent the night in jail and was released the next day on bond. The following day, Defendant Rick Bleichner ("Bleichner"), the chief of police for Normal, Illinois, issued a press release stating that Tricia had falsely reported that employees of A Shining Star Learning Center had abused her children, and that she had been charged with obstruction of justice and filing a false report. The press release further stated that Tricia knew the allegations were patently false, and A Shining Star Learning Center had fully and immediately cooperated with detectives. The daycare had been cleared of any wrongdoing.

On or about September 6, 2017, Ciardini went to I.D. and J.D.'s new daycare and examined them. She reported that I.D. had bruises on his body; however, Plaintiffs contend that he only had one bruise on his buttocks that was not caused by abuse, and the other marks on his body were from his eczema. Ciardini transported I.D. and J.D. to a hospital and the doctor told Ciardini that there were no bruises on I.D.'s body and he just had eczema. The doctor did not suspect abuse.

On the same day, Tricia recanted her confession and told Ciardini that DeRosa had pressured her into falsely admitting to having caused the mark on J.D.'s buttock. Around the same time, the *Pantagraph,* a daily newspaper that serves the Bloomington-Normal, Illinois area, published an article with a mugshot of Tricia indicating that she had confessed to having caused the mark on J.D.

Ciardini and Defendant Tracy Wolf ("Wolf"), a Public Service Administrator for DCFS, took protective custody of I.D. and J.D. When Ciardini learned that they were adopted, she placed them with a relative instead. DCFS also removed J.H. from Plaintiffs' custody and placed her with a relative. I.D. and J.D. remained in the custody of relatives for approximately three months.

On or about September 7, 2017, DeRosa completed her police report, which stated that she had watched the entire video from the daycare and that there was no misconduct captured. DeRosa concluded daycare employees did not cause the mark.

On or about September 13, 2017, Tricia was indicted by a grand jury on two felony charges: false report of an offense and obstruction of justice. On September 15, 2017, Tricia was formally arraigned. On or about October 16, 2017, DCFS indicated Tricia for child abuse. On October 18, 2017, the state's attorney filed an additional domestic battery charge against Tricia. On or about October 19, 2017, DCFS indicated Justin for child neglect because he was unwilling to consider that his wife caused the mark to J.D.

Plaintiffs' criminal attorney obtained the video from the daycare where he discovered the abuse and neglect by employees. Their attorney reported this to DCFS and requested that DCFS investigate the daycare. On November 27, 2017, I.D. and J.D. were returned to Plaintiffs, but the adjudication proceedings continued for another six months. On or about December 13, 2017, DCFS opened a complaint against A Shining Star Learning Center. On or about January 12, 2018, DCFS cited the daycare for multiple licensing violations based on the video footage. By February 2018, Plaintiffs' custody of I.D. and J.D. was fully restored, and in May 2018, the petition for adjudication was dismissed.

On June 22, 2018, the trial court suppressed Tricia's confession because it was involuntary and had been obtained by improper inducements. On July 27, 2018, after the suppression of the confession, Tricia agreed with the prosecution to plead guilty to disorderly conduct, a misdemeanor offense, in exchange for dropping the felony charge of filing a false report. The felony charge of obstruction of justice was dismissed *via nolle prosequi*. On July 31, 2018, the domestic battery charge was dismissed. Tricia was sentenced to six months of court supervision and four days in jail. On or about January 3, 2019, the DCFS indications against Plaintiffs were voluntarily unfounded. The Office of the Inspector General launched an investigation into Ciardini's misconduct, but the results of that investigation are confidential.

On July 26, 2019, Plaintiffs filed a Complaint (ECF No. 1) against Defendants and alleged: (1) unreasonable post-arrest seizure and/or pre-trial due process violations of Tricia against DeRosa and Ciardini; (2) knowing compulsion of an involuntary and false confession of Tricia against DeRosa and Ciardini; (3) retaliation in violation of Tricia's right to freedom of speech against DeRosa, Ciardini, Wolf, and Bleichner; (4) equal protection violations of Tricia against DeRosa, Bleichner, Ciardini, and Wolf, and of Justin against Ciardini and Wolf; (5) procedural

due process violations of Tricia against Ciardini and Wolf; (6) substantive due process violations of Tricia and Justin against Ciardini and Wolf; (7) 42 U.S.C. § 1983 conspiracy of Tricia against Ciardini; (8) state law malicious prosecution (criminal) of Tricia against DeRosa, Ciardini, and the Town of Normal, Illinois; (9) civil conspiracy of Tricia against Ciardini; (10) state law malicious prosecution (administrative and adjudicatory) of Tricia and Justin against Ciardini and Wolf; (11) intentional infliction of emotional distress of Tricia and Justin against Ciardini and Wolf; and (12) indemnification against the Town of Normal, Illinois. On October 28, 2019, the Normal Defendants filed a Motion to Dismiss (ECF No. 18) under Fed. R. Civ. P 12(b)(6) for the claims against them. On December 12, 2019, Defendants Ciardini and Wolf filed a Motion to Dismiss (ECF No. 23) under Fed. R. Civ. P. 8(a) and 12(b)(6) for the claims against them. This Opinion follows.

## STANDARD OF REVIEW

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is proper if a complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, which when accepted as true, states a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility means alleging factual content that allows a court to reasonably infer that the defendant is liable for the alleged misconduct. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007). A plaintiff's claim must "give enough details about the subject matter of the case to present a story that holds together" to be plausible. *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404 (7th Cir. 2010). A court must draw all inferences in favor of the non-moving party. *Bontkowski v. First Nat'l Bank of Cicero*, 998 F.2d 459, 461 (7th Cir. 1993).

When evaluating a motion to dismiss, courts must accept as true all factual allegations in the complaint. *Ashcroft*, 556 U.S. at 678. However, the court need not accept as true the complaint's legal conclusions; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atlantic Corp.*, 550 U.S. at 555). Conclusory allegations are "not entitled to be assumed true." *Id.*

## ANALYSIS

I.    **Count I – Unreasonable Post-Arrest Seizure and Pre-Trial Due Process Violation**

      *a. Heck v. Humphrey*

Count I has been brought by Tricia against Defendants DeRosa and Ciardini. Plaintiffs allege that Tricia was subjected to an unreasonable seizure by DeRosa and Ciardini when they violated her Fourth Amendment rights by knowingly extracting a false confession from Tricia. According to Plaintiffs, Tricia's false confession was used to secure her prosecution for the felony charges of filing a false police report and obstruction of justice, as well as a domestic battery charge. Plaintiffs claim there was no probable cause to believe that Tricia committed any of the offenses; therefore, Defendants are liable under 42 U.S.C. § 1983. The Normal Defendants argue that *Heck v. Humphrey,* 512 U.S. 477 (1994) precludes Plaintiffs' cause of action because Tricia entered a guilty plea as a result of the investigation and prosecution at issue in this case. Plaintiffs state that Tricia's action is not barred by *Heck,* because she does not imply that her guilty plea was invalid, and her plea was not based on the false confession. Instead, Plaintiffs contend that Tricia pleaded guilty to the misdemeanor based on the Facebook post where she indicated that she believed daycare employees had abused her children. Plaintiffs do not dispute that Tricia published the post, or that in doing so, she "acted in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." (ECF No. 1 at 18).

In *Heck,* the Supreme Court held that a plaintiff who has been convicted of a crime cannot maintain a § 1983 claim where "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Heck*, 512 U.S. at 487. The *Heck* rule "is intended to prevent collateral attack on a criminal conviction through the vehicle of a civil suit." *McCann v. Neilsen*, 466 F.3d 619, 621 (7th Cir. 2006). Where a claim is theoretically compatible with the underlying conviction, it may nevertheless be *Heck*-barred "if specific factual allegations in the complaint are necessarily inconsistent with the validity of the conviction." *Id.* at 621. Furthermore, "[i]t is irrelevant that [plaintiff] disclaims any intention of challenging [her] conviction; if [s]he makes allegations that are inconsistent with the conviction's having been valid, *Heck* kicks in and bars his civil suit." *Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003).

A plaintiff need not prove that any conviction stemming from an incident with the police has been invalidated, only a conviction that could not be reconciled with the claims of his civil action. *VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006). Plaintiffs have not alleged that Tricia's conviction has been reversed, expunged, invalidated or called into question. However, "[o]nly a claim that 'necessarily' implies the invalidity of a conviction … comes within the scope of *Heck*." *Gilbert v. Cook*, 512 F.3d 899, 902 (7th Cir. 2008). The Supreme Court has emphasized the need for a clear nexus between a plaintiff's conviction and the alleged wrongful government action before the *Heck* bar applies. In *Nelson v. Campbell*, 541 U.S. 637 (2004), the Court stated,

> [W]e were careful in *Heck* to stress the importance of the term "necessarily." For instance, we acknowledged that an inmate could bring a challenge to the lawfulness of a search pursuant to § 1983 in the first instance, even if the search revealed evidence used to convict the inmate at trial, because success on the merits would not "necessarily imply that the plaintiff's conviction was unlawful." *Heck,* 512 U.S. at 487 (noting doctrines such as inevitable discovery, independent source, and

harmless error). To hold otherwise would have cut off potentially valid damages actions as to which a plaintiff might never obtain favorable termination . . .

*Id.* at 647. Thus, whether this suit is barred by *Heck* hinges on whether an action against Defendants for unlawfully seizing Tricia after her false confession necessarily implies the invalidity of Tricia's guilty plea for disturbing the peace.

The Court finds that Plaintiffs' claim does not invalidate Tricia's guilty plea. Tricia's criminal conviction is not based on her false confession of injuring her children. That confession was used to charge her with filing a false police report, obstruction of justice, and domestic battery. Instead, her guilty plea was based solely on her Facebook post. Plaintiffs' Fourth Amendment claim also does not challenge the validity of that plea. Thus, an invalid seizure would not necessarily imply that her conviction was unlawful. *See Wallace v. Kato*, 549 U.S. 384, 393-94 (2007); *Brown v. Racine County*, 775 Fed. Appx. 256, 257 (7th Cir. 2019); *Rollins v. Willett*, 770 F.3d 575, 576 (7th Cir. 2014) (reasoning that since there was no trial, "[a] finding that the defendant was illegally seized—the finding he seeks in this suit—would therefore have no relevance to the validity of his guilty plea and ensuing conviction").

Even if Plaintiffs were to prevail on Tricia's unreasonable seizure arguments, her guilty plea would still stand. If the false confession unfolded as Plaintiffs allege in their civil suit, Tricia could still be guilty of disturbing the peace, because she created a post on Facebook that led to multiple individuals sharing it and inquiries into the daycare. In fact, the Normal Defendants state that "the confession could not have caused the guilty disposition." (ECF No. 18 at 5). Moreover, Tricia's original charges were not based on her Facebook post, but rather what she falsely confessed to during her interrogation – injuring her children. In the Complaint, Plaintiffs do not collaterally attack Tricia's conviction, deny that she posted on Facebook, or that it led to a disturbance of the peace. While the initial Facebook post is what led to the investigation, DeRosa's

and Ciardini's alleged extraction of Tricia's false confession ultimately does not invalidate her guilty plea of disturbing the peace.

Accordingly, the Court declines to dismiss Plaintiffs' unreasonable seizure claim under the Fourth Amendment claim.

     *b.  Due Process Clause*

Count I also alleges that Tricia was subjected to pre-trial deprivations of liberty without probable cause by Defendants DeRosa and Ciardini in violation of the Due Process Clause. The Normal Defendants argue that Plaintiffs' claim is not viable because the Supreme Court has made it clear that a claim for an arrest or seizure without probable cause sounds in the Fourth Amendment and not the Due Process Clause. Plaintiffs state Tricia's due process claim should not be precluded, because DeRosa and Ciardini unlawfully deprived her of liberty interests by knowingly using a false and involuntary confession to secure her pretrial conditions of release. During this time, Tricia contends that she spent months facing the prospect of significant prison time, was forced to defend herself against two felonies and a domestic battery charge, and was forced to attend numerous court dates.

The Normal Defendants are correct that Plaintiffs cannot bring a due process claim for unlawful pretrial detention or deprivations. In *Manuel v. City of Joliet, Ill*., 137 S. Ct. 911 (2017) ("*Manuel I")*, the Supreme Court held that pretrial detention after the legal process started did not give rise to a Fourth Amendment claim but could constitute a due process claim if state law failed to provide an adequate remedy. However, after *Manuel I* was decided, the Seventh Circuit explained that all § 1983 claims for wrongful pretrial detention sound in the Fourth Amendment. *Manuel v. City of Joliet*, 903 F.3d 667, 669-70 (7th Cir. 2018) ("*Manuel II*"). The court opined that the constitutional right in question is the "right not to be held in custody without probable

cause," the violation of which gives rise to a "plain-vanilla Fourth Amendment" claim under §

1983 because the essential constitutional wrong is the "absence of probable cause that would

justify the detention." *Id.* at 670 (citing *Manuel I*, 137 S.Ct. at 917–20). "In other words, the Fourth

Amendment, not the Due Process Clause, is the source of the right in a § 1983 claim for unlawful

pretrial detention, whether before or after the initiation of formal legal process." *Lewis v. City of

Chicago*, 914 F.3d 472, 479 (7th Cir. 2019).

As it can be seen, the Fourth Amendment is the source of right Plaintiffs seeks for Tricia's

§ 1983 claim for unlawful pretrial deprivations. Therefore, the Court dismisses Plaintiffs' due

process claim and considers the remaining allegations in Count I under the Fourth Amendment.

## II.    Count II – Knowing Compulsion of an Involuntary and False Confession

Count II has been brought by Tricia against Defendants DeRosa and Ciardini. Plaintiffs

claim that the Defendants violated her Fifth Amendment rights by using improper inducements

and lies to knowingly compel an involuntary and false confession from Tricia. Plaintiffs further

allege that the false confession was used as the sole basis to charge, indict, and prosecute Tricia

for two felonies and a domestic battery charge. The Normal Defendants claim that because Tricia's

alleged false confession was never utilized against her at trial, Count II must be dismissed.

Plaintiffs argue that Count II must remain because Tricia's false confession was used against her

in a criminal proceeding, specifically the September 13, 2017 grand jury hearing, which resulted

in her indictment.

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case

to be a witness against himself." U.S. CONST. amend. V. Regarding statements compelled by police

interrogations, the Supreme Court has said that "it is not until their use in a criminal case that a

violation of the Self–Incrimination Clause occurs." *Chavez v. Martinez*, 538 U.S. 760, 767 (2003).

The Seventh Circuit has held that a "criminal case" has begun when a criminal prosecution is not only initiated, but is commenced because of a confession, and that a defendant is compelled to be witness against himself in violation of the Fifth Amendment when his unlawful confession is introduced at a pretrial proceeding. *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1026–27 (7th Cir. 2006). In other words, a plaintiff's self-incrimination rights are violated the first time his or her confessions are introduced in a courtroom proceeding. *Saunders v. City of Chicago*, No. 12-CV-09158, 2013 WL 6009933, at 4 (N.D. Ill. Nov. 13, 2013), *on reconsideration in part,* No. 12-CV-09158, 2014 WL 3535723 (N.D. Ill. July 11, 2014).

The Normal Defendants contend that *Chavez* is the controlling case in this matter because the Supreme Court opined that a plaintiff could only bring forth a Fifth Amendment claim alleging a constitutionally invalid confession if the statement was used as evidence against them in a criminal proceeding. The Normal Defendants attempt to state that a criminal proceeding is meant to be solely indicative of a trial; however, that is incorrect. A probable cause hearing, a bail hearing, and arraignment have all previously been considered criminal proceedings. *See Sornberger,* 434 F.3d at 1027. Any courtroom proceeding that is commenced because of a confession would qualify. *Saunders,* 2013 WL 6009933, at 4. Here, Tricia was formally arraigned and indicted following a grand jury hearing. Therefore, Tricia's arraignment and grand jury hearing would suffice for Fifth Amendment claim purposes. Moreover, Plaintiffs' cause of action is distinguishable from *Chavez,* because the plaintiff in that case was never charged with a crime and his incriminating statements were never used against him in any criminal prosecution. Here, Tricia's statements were used against her during her arraignment and grand jury hearing where she was evidently criminally charged.

Accordingly, the Court declines to dismiss Count II.

### III.     Count III – Retaliation in Violation of Tricia's Right to Freedom of Speech

Count III has been brought by Tricia against Defendants DeRosa, Ciardini, Wolf, and Bleichner. Plaintiffs allege that Tricia engaged in speech protected by the First Amendment when she publicly posted her concerns about the daycare on Facebook. They claim that Defendants DeRosa and Ciardini retaliated against Tricia by using improper inducements to compel a false confession, causing her to be prosecuted for two felonies and a domestic battery charge. Plaintiffs further claim that Defendants DeRosa and Bleichner retaliated against Tricia by issuing a press release that publicly declared she falsely reported the alleged incident at the daycare, and that Defendants Ciardini and Wolf retaliated against her by indicating her for child abuse. The Normal Defendants argue that Plaintiffs have failed to allege that Tricia's speech was protected, that a deprivation occurred that would deter the alleged First Amendment activity, and that the activity was a motivating factor in the Defendants' decision to allegedly take retaliatory acts. Plaintiffs contend that Tricia's Facebook post was protected speech because she publicly posted a matter of public concern, that her post was a motivating factor for Defendants' actions against her and subsequent criminal charges, and the actions taken against her are likely to deter an individual from posting protected speech online if there were a risk that police would falsely charge them and then publicly humiliate them - as what Tricia claims happened to her.

To state a claim for First Amendment retaliation, a plaintiff must plausibly allege three elements: (1) the plaintiff engaged in an activity protected by the First Amendment; (2) the plaintiff suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the protected activity or speech was at least a motivating factor for the deprivation. *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008).

While the Court has not been presented with the contents of the public Facebook post verbatim, Plaintiffs allege enough facts for the Court to understand what the post entailed. The Complaint states that "Tricia Danyus posted the pictures of the marks on I.D. and J.D. to Facebook and indicated, in the same post, that she believed that employees of A Shining Star Learning Center had caused them." (ECF No. 1 at 5). The Court finds that the post contained speech on a matter of public concern, specifically, a local daycare that may have been injuring or neglecting children. Certainly, the community would want to know if their children were in some sort of danger. Indeed, Plaintiffs state that the Facebook post was shared and commented on by "hundreds of people." *Id.* Therefore, the first element for a First Amendment retaliation claim has been satisfied.

In order to meet the second element, Plaintiffs must sufficiently allege that the adverse action was enough to deter an ordinary person from engaging in that First Amendment activity in the future. If the allegations in the Complaint are taken as true, then an individual may be deterred from posting any concerns publicly on Facebook if there was a risk the police would investigate them and subsequently charge them for crimes that they alleged someone else may have committed. *See generally Majors v. Abell,* 317 F.3d 719, 721 (7th Cir. 2003) (holding that constitutionally protected speech may be deterred when there is a threat of prosecution "because most people are frightened of violating criminal statutes.") Here, Plaintiffs claim that due to Tricia's Facebook post, Defendants DeRosa and Ciardini pursued an investigation against her instead of the daycare, which subsequently caused Tricia to be prosecuted for two felonies and a domestic battery charge, be publicly humiliated, and indicated for child abuse by DCFS. The Court concludes that the risk of being investigated and subsequently criminally charged would deter an ordinary person from engaging in First Amendment activity. Upon taking the allegations as true, Plaintiffs have met the second element.

As for whether the First Amendment activity was a motivating factor in DeRosa's and Ciardini's alleged retaliation against Tricia, the Court finds that Plaintiffs have not plausibly alleged sufficient facts. Plaintiffs state that Tricia's Facebook post was a motivating factor for Defendants' conduct. However, Plaintiffs' Complaint infers that the underlying investigation may have been careless because DeRosa did not watch videos of the daycare in their entirety, conducted short interviews of employees, and was trying to "come up with another person to pin it on, ideally Tricia . . . so that she could falsely justify ending her 'investigation' into it." (ECF No. 1 at 7). These allegations do not suggest that the Facebook post motivated Defendants to criminally charge and publicly humiliate her, rather, they indicate that Defendants wanted to get the investigation over with swiftly, and in doing so, may have charged the wrong individual. Therefore, Plaintiffs have not met the third element.

Accordingly, the Court dismisses Count III without prejudice and grants Plaintiffs leave to file an amended complaint to re-plead this count within twenty-one (21) days, if they can do so in good faith.

### IV.    Count IV – Equal Protection Violations

Count IV has been brought by Tricia against Defendants DeRosa, Bleichner, Ciardini, and Wolf, as well as by Justin against Ciardini and Wolf. Plaintiffs claim that the way the Defendants treated the daycare and its employees, compared to them, demonstrates that the Defendants had an illegitimate animus against Plaintiffs. The Normal Defendants argue that Plaintiffs have failed to advance a "class of one" equal protection claim, because the daycare is not a sufficiently similarly situated comparator, Plaintiffs have failed to allege that there was no rational basis for any difference in treatment, and investigating Plaintiffs does not establish a pattern of harassment or other tort. Plaintiffs claim that Defendants have misinterpreted their argument, because they are

alleging they were treated differently from the employees of the daycare during the investigation, not the business entity of the daycare itself. Plaintiffs state that due to this different treatment, Defendants lacked a rational basis. Additionally, Plaintiffs contend that DeRosa and Bleichner wanted to protect the daycare.

The Fourteenth Amendment's Equal Protection Clause is typically "understood as protecting members of vulnerable groups from unequal treatment attributable to the state," but the clause "also proscribes state action that irrationally singles out and targets an individual for discriminatory treatment as a so-called 'class-of-one.' " *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 941 (7th Cir. 2010) (quoting *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010)). "[A]t a minimum," the claim "would require proof that the defendants intentionally treated [a plaintiff] differently from others situated similarly to [him or] her for no rational reason," *Williamson v. Curran*, 714 F.3d 432, 449 (7th Cir. 2013) (citing *Thayer v. Chiczewski*, 705 F.3d 237, 254 (7th Cir. 2012)), and it is unclear whether plaintiffs must also show improper motive, or "illegitimate animus," to successfully prove the claim, *see Thayer*, 705 F.3d at 254.

In any event, the bar for a class-of-one equal protection claim is high. If there is a "conceivable rational basis for the difference in treatment" suffered by the class member, then the claim fails. *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013); *see Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993) (explaining that under rational basis review in an equal protection challenge, "a classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' ") (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). The burden lies with the plaintiff to "overcome the presumption of rationality attached to government action." *Flying J Inc.*

*v. City of New Haven*, 549 F.3d 538, 545 (7th Cir. 2008). It is for this reason that animus, improper motive, and other factors that cast doubt on a possible rational basis are frequently pleaded. *See Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887, 913 (7th Cir. 2012) (Wood, J., dissenting) ("[these factors are] illustrative of the kind of facts on which a plaintiff might rely in a complaint to show that the lack of a rational basis is not merely possible, but plausible"). In this case, there are conceivable rational bases for the actions of each of the Defendants, and Plaintiffs do not offer any allegations to diminish the plausibility of these bases.

Plaintiffs allege that DeRosa and Ciardini violated Tricia's equal protection rights when they used improper inducements to compel her to falsely confess and subsequently be charged for two felonies and a domestic battery charge. Plaintiffs state this is because DeRosa and Ciardini wanted to protect the daycare from losing business. It is well known that the manner in which police conduct their investigations is within their discretion. *See Hilton City of Wheeling,* 209 F.3d 1005, 1007 (7th Cir. 2000) (stating that police have broad discretion in routine law enforcement matters.) Taking the allegations in the Complaint in the light most favorable to the Plaintiffs, the Court will interpret Plaintiffs' argument that daycare employees were similarly situated to them, as opposed to the business entity. Here, the employees and Tricia were investigated for potential child abuse. Plaintiffs assert that the employees were treated differently than them; however, the Court finds that the allegations do not reflect that to be the case. According to the Complaint, the daycare employees were interviewed for approximately fifteen to twenty minutes *each*, and the daycare owner and director for thirty minutes. (ECF No. 1 at 6) (emphasis added). This does not include the time DeRosa reviewed the video tape of the daycare along with any other investigative duties she performed. Tricia's first interrogation lasted for one hour and her second was over two hours. (ECF No. 1 at 8, 14). Therefore, her interrogations lasted approximately three hours. This

includes the instances where Tricia was left alone in the room during her second interrogation - one hour on one occasion and seven minutes for another. *Id.* at 12. The Court does not find that there was a significant disparity in the length of time spent between speaking with the employees and Tricia, especially since Tricia's second interrogation purportedly includes at least an hour where she was not questioned. As it can be seen, the allegations in the Complaint demonstrate that the employees and Tricia were both investigated in similar fashions. Moreover, Plaintiffs allege that after the first interrogation, DeRosa contacted DCFS and was told the case would be assigned to an investigator. *Id.* at 8. That investigator became Ciardini. There is nothing in the Complaint that would suggest that Ciardini was not chosen at random by DCFS to be assigned to the investigation. In other words, the Complaint lacks any allegation that would suggest Ciardini targeted Tricia specifically. Whichever manner Ciardini chose to interrogate Tricia was up to her discretion. Accordingly, the Court finds that DeRosa and Ciardini did not intentionally treat Tricia differently from the daycare employees during the investigation and Plaintiffs have not overcome the presumption of rationality as to DeRosa's and Ciardini's actions in this regard.

Plaintiffs allege that DeRosa and Bleichner violated Tricia's equal protections rights by issuing a press release that stated she had falsely reported daycare employees had abused her children. Bleichner was the chief of police of Normal, Illinois at the time of the incident and, according to the Complaint, never interrogated Tricia. There are no allegations to rebut the inference that Bleichner was simply following protocol. In other words, it is typical procedure for police stations to issue press releases, or similar announcements, when someone is charged. *See generally Doe v. Ziemer,* No. 18-CV-3234, 2019 WL 1916194, at *2 (C.D. Ill. Apr. 30, 2019) (stating that plaintiff's name was part of the public record once she was indicted.) Plaintiffs also claim that DeRosa conspired and worked with Bleichner on the press release, but there are no

allegations in the Complaint that support this assertion. Therefore, Plaintiffs have not overcome the presumption of rationality as to DeRosa's and Bleichner's actions in regard to issuing the press release.

Furthermore, Plaintiffs allege that Ciardini and Wolf violated their equal protection rights by indicating Tricia for child abuse and indicating Justin for child neglect. Plaintiffs contend that this caused them to lose their foster home license, custody of I.D., J.D., and J.H. for months, and to lose the ability to adopt J.H. and I.D. and J.D.'s biological sibling. Plaintiffs claim Ciardini and Wolf did this to protect the daycare. The Complaint is completely devoid of any allegations that would propose Ciardini and Wolf would have acted differently after Tricia was charged with the felonies and domestic battery. There is nothing to suggest that both Defendants were not following standard protocol after an investigation resulted in the criminal charges Tricia received. Furthermore, the Court fails to see how Plaintiffs were treated differently from the daycare employees in this regard since the employees were not criminally charged at the time Plaintiffs were indicated. It is nonsensical to assume the daycare and its employees should have endured the same consequences when, at the time, the daycare was not charged with any crime. Accordingly, Plaintiffs have not overcome the presumption of rationality as to Ciardini and Wolf in regard to the indications Plaintiffs received following Tricia's criminal charges.

Accordingly, the Court dismisses Count IV without prejudice and grants Plaintiffs leave to file an amended complaint to re-plead this count within twenty-one (21) days, if they can do so in good faith.

## V. Count VIII – State Law Malicious Prosecution

Count VIII has been brought by Tricia against Defendants DeRosa, Ciardini, and the Town of Normal, Illinois. Plaintiffs allege that DeRosa facilitated the malicious prosecution by

compelling a false confession from Tricia, "by providing the information she unlawfully obtained to a police sergeant who reiterated that information in front of a grand jury, by creating false and/or misleading criminal complaints and police reports . . . and by giving false and misleading information to prosecutors." (ECF No. 1 at 32). Plaintiffs further allege that Ciardini facilitated the malicious prosecution by unlawfully compelling Tricia to confess. The Normal Defendants argue that Plaintiffs' cause of action for malicious prosecution is not viable because Tricia's prosecution did not terminate in her favor since she entered a guilty plea. Plaintiffs claim that deposition testimony and other evidence may show that the prosecution dismissed the charges because it did not have any evidence to support them after Tricia's confession had been suppressed. Therefore, according to Plaintiffs, the Court cannot dismiss the claim at this stage.

Under Illinois law, to state a cause of action for malicious prosecution, a plaintiff must allege facts showing: (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceedings; (4) the presence of malice; and (5) damages resulting to the plaintiff. *Mut. Med. Plans, Inc. v. County of Peoria*, 309 F.Supp.2d 1067, 1080 (C.D. Ill. 2004).

Here, there was certainly a commencement of a criminal judicial proceeding as the information obtained during Tricia's interrogation was used during her grand jury proceeding and subsequently two felony charges and a domestic battery charge. On July 27, 2018, Tricia's felony charge for filing a false police report was reduced to a misdemeanor charge for disorderly conduct as part of a plea deal. On the same date, the felony charge for obstruction of justice was dismissed *via nolle prosequi.* On July 31, 2018, Tricia's domestic battery charge was dismissed. A termination of criminal proceedings in favor of the accused can only occur when the charges are

abandoned for reasons that indicate the accused is innocent. *Washington v. Summerville*, 127 F.3d 552, 557–58 (7th Cir.1997); *see Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996). In determining whether a disposition constitutes a "favorable termination" of the proceedings, courts must look at the circumstances under which the disposition was obtained, not the form or title. *Cult Awareness Network v. Church of Scientology Int'l*, 685 N.E.2d 1347, 1352–53 (Ill. 1997). In *Swick*, the Illinois Supreme Court considered the question of whether a criminal proceeding terminated by a *nolle prosequi* had ended favorably for the accused. A *nolle prosequi* is a formal entry of record whereby the prosecuting attorney formally declares that he or she is unwilling to prosecute a case. *Ferguson v. City of Chi.*, 820 N.E.2d 455, 460 (Ill. 2004). The Illinois Supreme Court stated that "[t]he abandonment of the proceedings is not indicative of the innocence of the accused when the *nolle prosequi* is the result of an agreement or compromise with the accused, misconduct on the part of the accused for the purpose of preventing trial, mercy requested or accepted by the accused, the institution of new criminal proceedings, or the impossibility or impracticability of bringing the accused to trial." *Swick*, 662 N.E.2d at 1243. A plaintiff bears the burden of establishing that the underlying criminal proceedings ended favorably for her and this can occur when a *nolle prosequi* was entered for reasons consistent with her innocence. *Id.*

Here, while the grand jury indicted Tricia on two felony charges for obstruction of justice and filing a false police report, as well as a domestic battery charge, she eventually pled guilty to a misdemeanor disorderly conduct charge. The Complaint alleges that the plea agreement included pleading guilty to the disorderly conduct charge in exchange for dropping the felony charge for filing a false report. Plaintiffs state that the felony charge for obstruction of justice ended by *nolle prosequi,* and a few days later, the domestic battery charge was dropped. Plaintiffs claim that the prosecution did not pursue the remaining charges because they did not have any evidence to

support them after Tricia's confession had been suppressed. (ECF No. 1 at 18; ECF No. 21 at 15). Thus, according to Plaintiffs, the abandonment of the original charges resulted from a plea agreement as well as the impossibility or impracticability of bringing the accused to trial. *See Swick*, 662 N.E.2d at 1243. These reasons do not constitute a favorable resolution for Tricia. In fact, as a result of her guilty plea, Tricia was sentenced to six months of court supervision and four days in jail. (ECF No. 1 at 18). She was not able to completely walk away without some penalty.

Because Plaintiffs have not established the second element of a malicious prosecution claim, the Court dismisses Count VIII without prejudice and grants Plaintiffs leave to file an amended complaint to re-plead this count within twenty-one (21) days, if they can do so in good faith.

## VI.  Count XII – Indemnification

Count XII has been brought by Tricia against the Town of Normal. Plaintiffs allege that under 745 Ill. Comp. Stat. Ann. 10/9-102, the Town of Normal must pay any tort judgment or settlement for which DeRosa and Bleichner, their employees, committed within the scope of their employment. The Normal Defendants argue that without finding of liability or judgment on Plaintiffs' cause of action, there can be no indemnification by the Town. Plaintiffs claim that since the Normal Defendants have not shown that all of their claims against DeRosa and Bleichner must be dismissed, then the indemnification claim must stand.

Section 9/102 states that "[a] local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages (and may pay any associated attorney's fees and costs) for which it or an employee while acting within the scope of his employment is liable."

While no claims remain against Bleichner[2], there are still remaining claims against DeRosa. Therefore, the Court declines to dismiss Count XII as the Town of Normal may still be liable under the statute if Plaintiffs obtain a judgment or settlement against DeRosa.

## VII.    Federal Rule of Civil Procedure 8(a)

Defendants Ciardini and Wolf claim that Plaintiffs' Complaint violates Fed. R. Civ. P. 8(a) because it is too long since it compromises of 298 paragraphs and 39 pages total. Plaintiffs argue that the paragraphs are brief, coherent, and straightforward. Plaintiffs further argue that the allegations are directed at specific Defendants, of which there are five, and each cause of action provides the specific Defendant with notice of how and why their conduct entitles Plaintiffs to relief.

"Rule 8(a) requires parties to make their pleadings straightforward, so that judges and adverse parties need not try to fish a gold coin from a bucket of mud." *US. ex rel. Garst v. Lockheed–Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003). "[W]here the lack of organization and basic coherence renders a complaint too confusing to determine the facts that constitute the alleged wrongful conduct, dismissal is an appropriate remedy." *Stanard v. Nygren*, 658 F.3d 792, 798 (7th Cir. 2011). However, "undue length alone ordinarily does not justify the dismissal of an otherwise valid complaint." *Id.* at 797; *see Davis v. Ruby Foods, Inc.*, 269 F.3d 818, 820 (7th Cir. 2001) (stating that dismissal is inappropriate "merely because of the presence of superfluous matter."). The purpose of Rule 8(a) is to ensure that the defendants have "fair notice of the claims against them and the grounds supporting those claims." *See Lawrence v. Secretary of State*, 467 Fed. Appx. 523, 524 (7th Cir. 2012)

---

[2] The Court has granted Plaintiffs leave to re-file an amended complaint if they can do so in good faith. As of the date of this Order, there are no claims remaining against Bleichner; however, if Plaintiffs choose to file an amended complaint, his status as a party to this case may change.

The Court finds that Plaintiffs' Complaint satisfies Fed. R. Civ. P. 8(a). The Complaint is organized in a manner that gives notice to which Defendant each cause of action applies to. Plaintiffs assert a series of factual allegations that support each claim or conclusion. Although the complaint is repetitive at times, a "district court is not authorized to dismiss a complaint merely because it contains repetitious and irrelevant matter." *Garst*, 328 F.3d at 378 (internal quotation marks omitted). The Complaint is long because Plaintiffs have sued a number of Defendants and have brought forth several claims. Accordingly, the Court finds that Plaintiffs' Complaint is not unnecessarily long or confusing and declines to dismiss the Complaint.

## CONCLUSION

For the reasons stated above, the Normal Defendants' Motion to Dismiss [18] is GRANTED IN PART and DENIED IN PART. Defendants Ciardini and Wolf's Motion to Dismiss [23] is DENIED. Regarding Count I, Plaintiffs may proceed on their claim for unreasonable seizure under the Fourth Amendment, but not their due process claim. In addition, Counts II and XII remain, Counts III, IV, and VIII are dismissed without prejudice and the Court GRANTS Plaintiffs leave to file an amended complaint to re-plead these counts within twenty-one (21) days of this Order, if they can do so in good faith.

ENTERED this 10th day of March, 2020.


    ___/s/ Michael M. Mihm____
    Michael M. Mihm
    United States District Judge